QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
David W. Quinto (Bar No. 106232)
davidquinto@quinnemanuel.com
Bruce E. Van Dalsem (Bar No. 124128)
brucevandalsem@quinnemanuel.com
Stan Karas (Bar No. 222402)
stankaras@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Defendants KSL Biltmore Resort Inc., KSL Recreation Corporation, Jobing.com, Gannett, Inc., America West Vacations, Spa Finder Travel Arrangements, Ltd., Spring Training Tours, American Express Company, The Leisure Company, Internet Publishing Corporation

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MASTERSON MARKETING, INC., a California Corporation,

Plaintiff,

vs.

KSL RECREATION CORPORATION, a Delaware corporation; et al.

Defendant.

And Related Cross-Action

CASE NO. 02 CV 02028-L (CAB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF JEFF SEDLIK**

Date: December 13, 2007
Time: 11:00 a.m.
Judge: Hon. Cathy Ann Bencivengo

# TABLE OF CONTENTS

Page

INTRODUCTORY STATEMENT ..... 1

FACTUAL BACKGROUND AND PLAINTIFF'S CONTENTIONS ..... 2

SUMMARY OF SEDLIK'S OPINIONS ..... 3

ARGUMENT ..... 5

I. IN ITS "GATEKEEPER" ROLE, THE COURT IS REQUIRED TO EXCLUDE IMPROPER EXPERT TESTIMONY ..... 5

II. SEDLIK'S CONTRADICTORY OPINIONS IN *STRAUS* DEMONSTRATE THAT HIS ANALYSIS IS INADMISSIBLE "JUNK SCIENCE" ..... 7

III. SEDLIK IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ON DAMAGES ..... 9

IV. SEDLIK OFFERS IMPROPER LEGAL CONCLUSIONS ..... 11

V. SEDLIK'S OPINIONS REGARDING THE VALUE OF THE ALLEGEDLY LOST IMAGES ARE IRRELEVANT TO PLAINTIFF'S CLAIM FOR COPYRIGHT INFRINGEMENT ..... 13

VI. SEDLIK'S DAMAGES ANALYSIS IS INADMISSIBLE AS A MATTER OF LAW ..... 14

A. Sedlik's 300% "Scarcity Multiplier" Is Speculative and Unfounded ..... 15

B. Sedlik's Calculation of Damages Based Upon the Website Defendants' Usage Ignores Industry Custom and Practice ..... 18

C. Sedlik's Conclusions Regarding the Effect of Infringement on the Market Value of Plaintiff's Photographs ..... 20

D. Sedlik Improperly Bases His Analysis on Gross Licensing Revenue ..... 21

E. Sedlik's Conclusions Fail the "Common Sense" Test ..... 22

VII. CROSS-EXAMINATION IS NOT A SUFFICIENT REMEDY ..... 23

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page**

## Cases

*AT&T Wireless Servs. of Cal. LLC v. City of Carlsbad*, 308 F. Supp. 2d 1148 (S.D. Cal. 2003) .......... 6

*Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443 (9th Cir. 1992) .......... 11, 12

*American Booksellers Ass'n*, 135 F. Supp. 2d at 1041 .......... 14, 16

*Arbuthnot v. Relocation Realty Service Corp.*, 227 Cal. App. 3d 682 (1991) .......... 23

*Atlantic Richfield Co. v. Farm Credit Bank of Wachita*, 226 F.3d 1138 (10th Cir. 2000) .......... 15

*Baker v. Urban Outfitters*, 431 F. Supp. 2d 351 (S.D.N.Y. 2006) .......... 22

*Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003) .......... 18

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993) .......... 14

*Bruce v. Weekly World News, Inc.*, 310 F.3d 25 (1st Cir. 2002) .......... 19

*Concord Boats Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) .......... 17

*Coogan v. Avnet*, (D. Ariz., Case No. CV-04-0621 PHX SRB) .......... 5

*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) .......... 11, 12

*Curtis v. Gen'l Dynamics Corp.*, 1990 WL. 302725 (W.D.Wash. 1990) .......... 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 1, 2, 5, 6, 7, 9, 10, 13, 14, 23

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) .......... 6, 9

*Elcock v. K -Mart Corp.*, 232 F.3d 734 (3d Cir. 2000) .......... 6

*First Savings Bank v. U.S. Bancorp*, 117 F. Supp. 2d 1078 (D. Kan. 2000) ..... 10

*Frasier v. Adams-Sandler, Inc.*, 94 F.3d 129 (4th Cir. 1996) ..... 13

*Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir.2000) (listing cases) ..... 5

*Graham by Graham v. Wyeth Lab*, 906 F.2d 1399 (10th Cir. 1990) ..... 9

*Hillebrand v. Bodionics, Ltd.*, (California Superior Court - County of Riverside, Case No. INC011593) ..... 5

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F. Supp. 709 (S.D.N.Y.1995) ..... 13

*JMJ Enter., Inc. v. VIA Veneto Italian Ice, Inc.*, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998) ..... 15

*JRL Enter., Inc. v. Procorp Assoc.*, 2003 WL 21284020 (E.D. La. June 3, 2003) ..... 15

*Jarvis v. K2, Inc.*, 486 F.3d 526 (9th Cir. 2007) ..... 19, 22

*Johnson Elec. N. Am., Inc. v. Mabuchi N. Am. Corp.*, 103 F. Supp. 2d 268 (S.D.N.Y. 2000) ..... 15, 22

*Kemp v. Tyson Seafood Group, Inc.*, 2000 WL 1062105 (D. Minn. July 19, 2000) ..... 15

*Knauer v. Kaiser Permanente* (N.D.Cal., Case No. C02-05172 DLJ EMC) ..... 5

*Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303 (S.D.N.Y. 2001) ..... 16

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551 (S.D.N.Y. 2002) ..... 11

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450 (D.N.J. 1998) ..... 6, 23

*Mackie v. Reiser*, 296 F.3d 909 (9th Cir. 2002) ..... 18

*Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892 (9th Cir. 1993) ..... 11

*McHugh v. United Service Auto. Ass'n*, 164 F.3d 451 (9th Cir. 1999) ..... 12

*Nieves-Villanueva v. Soto-Rivera*,
133 F.3d 92 (1st Cir. 1997) ........ 11, 12

*Photographic Illustrators Corpopration v. The Gillette Company*,
(D. Mass., Case No. 04-CV-10913-WGY) ........ 5

*Playboy Enters, Inc. v. Terri Welles, Inc.*,
78 F. Supp. 2d 1066 (S.D. Cal. 1999) ........ 11

*Regents of University of Minnesota v. Applied Innovations, Inc.*,
685 F. Supp. 698 (D. Minn. 1987) ........ 21

*Seaboard Lumber v. United States*,
308 F.3d 1283 (Fed.Cir.2002) ........ 5

*Smith v. Goodyear Tire & Rubber Co.*,
__ F.3d __, 2007 WL 2200700 (5th Cir. 2007) ........ 10

*Straus v. DVC Worldwide, Inc.*,
(S.D. Tex., Case No. H-04-5625) ........ 5, 7, 8, 9

*Sun Ins. Mktg. Network, Inv. v. AIG Life Ins. Co.*,
254 F. Supp. 2d 1239 (M.D. Fla. 2003) ........ 10

*Taylor v. Meirick*,
712 F.2d 1112 (7th Cir. 1983) ........ 21

*U.S. v. Duncan*,
42 F.3d 97 (2d Cir. 1994) ........ 11

*United States v. Chang*,
207 F.3d 1169 (9th Cir. 2000) ........ 9, 10

**Statutes**

17 U.S.C. § 106 ........ 13

*Fed. R. Evid.* 401 ........ 12, 14

*Fed. R. Evid.* 402 ........ 12, 14

*Fed. R. Evid.* 403 ........ 14

*Fed. R. Evid.* 702 ........ 5, 6, 9, 11, 12, 13, 14, 23

*Fed. R. Evid.* 704 ........ 11

**Other Authorities**

Howard B. Abrams,
LAW OF COPYRIGHT, § 5.3 (2006) ........ 14
LAW OF COPYRIGHT, § 17.2 (ed. 2006) ........ 21

William M. Hart, et al.,
AN OVERVIEW OF COPYRIGHT LAW, 783 PLI/P (2004) .......... 13

Raymond T. Nimmer,
INFORMATION LAW, § 6.14 (2007) .......... 14

NIMMER ON COPYRIGHT, § 8.01[A] .......... 13

John W. Strong,
MCCORMICK ON EVIDENCE, § 13 (5th ed. and Supp. 2003) .......... 6

Introductory Statement

Plaintiff alleges that defendant KSL Recreation Corporation ("KSL") infringed ten photographs of the Arizona Biltmore hotel by posting them on its website and making them available for download to travel websites. The Court will try a single issue: plaintiff's actual damages from the alleged copyright infringement. Plaintiff designated Jeff Sedlik, a photographer, as its damages expert. Although the parties' prior arm's-length negotiations demonstrate that the buy-out value of the images is approximately $10,000, Sedlik contends that plaintiff's actual damages exceed two million dollars. He also opines that defendants committed copyright infringement. The Court should exclude Sedlik's opinions pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("Daubert I"), 509 U.S. 579 (1993), as embodied in Federal Rule of Evidence 702.

First, Sedlik improperly offers expert opinions regarding legal issues and the alleged damages caused by defendants' infringement even though he does not have any educational or professional background in economics, accounting or law. In fact, Sedlik has *never* testified as a damages expert in a copyright case.[1]

Second, Sedlik's opinions largely consist of mere legal conclusions. It is well-established that experts may not testify regarding questions of law. That is especially true here because Sedlik has no legal training. Further, to the extent Sedlik opines on liability, his opinions are irrelevant because defendants stipulated to liability, and the only issue to be tried is plaintiff's actual damages, if any.

Third, Sedlik's opinions regarding the value of the photographic negatives that KSL allegedly did not return are irrelevant. The only claim is copyright infringement, but the failure to return a copyrighted work is not an infringement. The Court should not permit Sedlik to testify on issues that are irrelevant to plaintiff's claim.

---

[1] As explained in note 5, below, Sedlik was referenced in those other copyright cases but did not testify.

Fourth, Sedlik's opinions are unreliable "junk science." For instance, Sedlik applies a 300% "scarcity multiplier" to the alleged lost licensing value of plaintiff's photographs. Sedlik admitted in deposition, however, that he had no factual basis for trebling plaintiff's damages with a stroke of a pen. Notably, Sedlik recently submitted an expert report in a copyright case on behalf of the defendant and came to conclusions diametrically opposed to the ones he offers here. That is also a tell-tale sign of inadmissible "junk science." (That case settled before Sedlik's opinions could be challenged by a *Daubert* motion.)

Fifth, Sedlik's opinions are not "sufficiently tied to the facts of the case." He ignores all relevant information that would lower his damages calculations. For example, Sedlik ignores that plaintiff placed a value of only $10,000 on a complete copyright buy-out of similar photographs, and that in the real world KSL would have purchased a low-cost "web pack" license for the images rather than having each third-party travel agency website negotiate a separate license, as Sedlik assumes. Likewise, Sedlik assumes that numerous third parties would pay plaintiff hundreds of thousands of dollars to license his photographs of the Arizona Biltmore hotel. Yet, Sedlik does not -- and cannot -- identify any such "lost opportunities." Indeed, plaintiff has never licensed these site-specific photographs to anyone but the Biltmore itself. Nor has plaintiff ever made close to the seven-figure licensing fees at which Sedlik arrives. Sedlik also includes in his damages analysis numerous third party defendants with whom plaintiff already settled. His analysis is inadmissible because he ignores these and other key facts.

Sedlik's "expert" opinions are defective from top to bottom, and fall far short of the minimum standards for admissibility. Accordingly, the Court should exclude Sedlik's improper testimony.

Factual Background and Plaintiff's Contentions

Plaintiff's principal, Ed Masterson, is an advertising agent and commercial photographer. Between 1999 and 2001, plaintiff was an advertising agent for the Arizona Biltmore hotel. In April 1998, plaintiff performed a comprehensive photographic shoot at the Arizona Biltmore. The

contract price included a buy-out of the copyrights in the photographs.[2] In February 2000, plaintiff performed another shoot at the hotel for $25,000. The principal difference between the two contracts was that the second did not include a copyright buy-out of the images that Masterson took, but included instead a license to use the photographs pursuant to a year-long advertising and marketing contract. The subjects of plaintiff's photographs are routine for hotel advertising: a couple drinking wine, a cabana, a hot tub, the hotel's facade, the view from the hotel's grounds, a swimming pool, and so on. In 2001, after KSL purchased the Arizona Biltmore, plaintiff's agency agreement was not renewed. Plaintiff brought suit shortly thereafter.

KSL maintains a password-protected website from which travel agents may download images of the Arizona Biltmore to use on their websites. Plaintiff contends that KSL exceeded the scope of the license and infringed its copyrights by posting ten photographs on that website.[3] Notwithstanding that the Court seemingly entered summary adjudication for defendants on the issue,[4] plaintiff also contends that KSL infringed his image of a nearby mountain, Squaw Peak, taken from the hotel's grounds, by commissioning a different photographer to take a different photograph of it.[5]

<u>Summary of Sedlik's Opinions</u>

Sedlik is a commercial photographer. Declaration of Stan Karas, Exh. A (Preliminary Expert Report and Disclosure of Jeff Sedlik ("Sedlik Report")), at 2. Although he took introductory college classes in economics, he has no degree or professional background in statistics, mathematics, law or economics. Karas Decl., Exh B ("Sedlik Tr")., 40:23-41:3, 41:13-

---

2 Plaintiff contends that it separately licensed to the hotel several photographs taken during a preparatory "walk-around" shoot.

3 It is not clear whether Sedlik assumes that ten images were infringed or eleven. *Compare* Sedlik Report at 18 (referring to "Masterson's 10 photographs") *with id.*, Exh. F (listing eleven images).

4 *Masterson Marketing Inc. v. KSL Recreation Corp.*, 495 F. Supp. 2d 1044 (2007).

5 Plaintiff contends that the Court's recent order granting partial summary judgment regarding Squaw Peak photograph taken by Evan Schiller does not resolve the issue. Defendants disagree.

23. Sedlik's only degree is a B.F.A. from the Art Center College of Design in Pasadena. *Id.*, 38-23-39:4.

Based upon his review of the complaint and discovery materials, Sedlik assumes that KSL used plaintiff's photographs after the pertinent licenses expired.[6] Sedlik opines that such uses "constitute[] an infringement on Masterson's copyright in such photographs." Sedlik Report at 12. Sedlik also asserts that KSL infringed by "plac[ing] Masterson's images on its web sites and encourag[ing] third parties to download hi-resolution files of the images and use Masterson's photographs without license." *Id.* at 12-13.

Sedlik seeks to calculate plaintiffs' actual damages by

> obtain[ing] license fee quotes from two leading stock photography agencies, Getty Images and Corbis. [Sedlik] calculated total fees based on . . . some or all of these factors: the number of uses of each image, the media in which the photographs were reproduced, the reproduction quantity for each use, the size and placement of reproduction, and the period of use. Where one or more criteria were missing [he] made the best approximation under the circumstances. [Sedlik] then added a treble multiplier for the scarcity of the photographs. *Id.* at 15.

If neither Corbis nor Getty provided pricing, Sedlik "relied on [his] knowledge of licensing to compute additional actual damages." *Id.* Sedlik concedes that the "license [i.e., infringement] period" used in his computations is only an approximation. *Id.* With respect to the travel agent website defendants, Sedlik asserts that "Masterson is entitled to additional actual damages equal to the fee that Masterson would have reasonably required from KSL for a license to sublicense Masterson's photographs to third parties for unlimited and unknown uses." *Id.* at 16. Sedlik does not apply a volume discount to this calculation. Indeed, he assumes that KSL would have paid a full retail license rate for each use of an image by a travel agency website defendant.

Sedlik also claims that KSL's use of plaintiff's images "may have exhausted the residual value of these photographs over the entire lifetime of Masterson's copyrights." *Id.* at 17.

---

[6] Sedlik assumes that the infringement continued for at least five years, through 2006. Sedlik Report at 19. This assumption has no support in the evidentiary record.

Similarly, Sedlik claims that plaintiff lost the ability to license "first use" of the photographs in various media. *Id.* Sedlik asserts that

> The value of such lost sales is difficult to approximate with certainty, but based on my knowledge and experience, a reasonable approximation of the effect of such lost sales to Masterson resulting from KSL's use is $5000 per year per photograph over the five year period beginning 2002 [sic], and $10,000 per photograph thereafter over the remainder of the copyright life of the photograph, for a total of $35,000 per photograph, or $350,000 in total for Masterson's 10 photographs. *Id.* at 18.

Sedlik opines that plaintiff suffered $ 2,166,977.26 in actual damages. Defendants' damages experts -- Jeffrey Kinrich (who has an M.B.A. in finance, an M.S. in statistics and finished second nationally on the C.P.A. exam) and Gerald Bybee, a prominent photographer -- calculate plaintiff's actual damages to be less than $15,000.[7] It does not appear that Sedlik has ever testified at trial as a damages expert, let alone as an expert on copyright damages.[8]

## Argument

## I. IN ITS "GATEKEEPER" ROLE, THE COURT IS REQUIRED TO EXCLUDE IMPROPER EXPERT TESTIMONY

"[I]n a bench trial, where no screening of the factfinder can take place, the *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met." *Seaboard*

---

[7] Jeffrey Kinrich concludes that plaintiff's actual damages are $11,000; Gerald Bybee opines that the stock value of the images "is worth $5000 dollars or less in net income from all commercial sources . . . for the relevant years and even less in the future." Karas Decl., Exhs. C and D.

[8] In *Straus v. DVC Worldwide, Inc.*, (S.D. Tex., Case No. H-04-5625), Sedlik submitted an expert report that is contradictory to his opinions in this case, but the case settled before trial. Similarly, the parties in *Knauer v. Kaiser Permanente* (N.D.Cal., Case No. C02-05172 DLJ EMC) settled before the defendant filed a motion in limine concerning Sedlik. In *Coogan v. Avnet*, (D. Ariz., Case No. CV-04-0621 PHX SRB), Sedlik's opinion was excluded because it was not timely disclosed. In *Photographic Illustrators Corpopration v. The Gillette Co.*, (D. Mass., Case No. 04-CV-10913-WGY), the Court allowed Sedlik to testify on the narrow topic of industry custom and practice, -- as opposed to copyright damages -- but the case settled before trial. In *Hillebrand v. Bodionics, Ltd.*, (California Superior Court - County of Riverside, Case No. INC011593), a right of publicity case, Sedlik testified for less than three hours regarding the industry practice regarding obtaining model releases.

*Lumber v. United States*, 308 F.3d 1283, 1302 (Fed.Cir.2002); *see also Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir.2000) (district courts are "required to rely only on admissible and reliable expert testimony, even while conducting a bench trial.") (Gilman, J., dissenting) (listing cases).

Under *Daubert*, a court must follow a three-step analysis. First, the Court must determine whether the witness qualifies as an expert "by knowledge, skill, experience, training, or education . . . [to] testify thereto." *See Fed. R. Evid.* 702. The witness must be "more competent to draw the inference than the lay jurors and judge." JOHN W. STRONG, MCCORMICK ON EVIDENCE, § 13 (5th ed. and Supp. 2003); *see also Elcock v. K -Mart Corp.*, 232 F.3d 734, 741 (3d Cir. 2000).

Second, the Court must decide whether the expert will testify to "scientific, technical or other specialized knowledge" that will assist the trier of fact. *See Fed. R. Evid.* 702. This requires an inquiry into the reliability of the expert's opinion. *See Daubert* I, 509 U.S. at 589-90; *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316-17 (9th Cir. 1995) (*"Daubert II"*). In that inquiry, courts consider a variety of factors, including the reliability of the methods used to reach a conclusion and the manner in which the methods are applied. *Fed. R. Evid.* 702; *Daubert I*, 509 U.S. at 592-93; *Daubert* II, 43 F.3d at 1316-17.

Third, the Court must conclude that the expert testimony is relevant and "fits" the facts of the case - *i.e.*, is "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *See Daubert I*, 509 U.S. at 591 (quotation and citation omitted).

The burden is on the proponent to demonstrate by a preponderance of the evidence that the proposed testimony satisfies each of these requirements. *See Daubert I*, 509 U.S. at 593, n.10; *Daubert II*, 43 F.3d at 1316. It is no remedy that the party opposing admission of the expert testimony will have the opportunity to cross-examine the expert at trial and present rebuttal testimony. *See Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 458 (D.N.J. 1998) ("To conclude that evidence is admissible because it is subject to [cross-examination] is . . . circular."). As set forth below, Sedlik's analysis does not come close to meeting these rigorous standards.

II. SEDLIK'S CONTRADICTORY OPINIONS IN *STRAUS* DEMONSTRATE THAT HIS ANALYSIS IS INADMISSIBLE "JUNK SCIENCE"

"[T]he Supreme Court established that the trial court must act as a gatekeeper to prevent 'junk science ' from entering the courtroom in the guise of 'expert' testimony." *AT&T Wireless Servs. of Cal. LLC v. City of Carlsbad*, 308 F. Supp. 2d 1148, 1156 (S.D. Cal. 2003) (*citing Daubert I*, 509 U.S. at 592-93). "[E]xpert testimony, whether experience based or strictly scientific, must be reliable." *Id.*

In 2006, Sedlik served as the defendants' expert witness on damages in *Straus v. DVC Worldwide, Inc.*, (S.D. Tex., Case No. H-04-5625). The case settled before the plaintiff could bring a *Daubert* motion. *See* Karas Decl., ¶ 6.[9] In *Straus*, the plaintiff alleged that the defendants created an infringing derivative work of his photograph of Arnold Palmer, the famous golfer, by retouching another photograph. (A copy of the *Straus* report is attached to the Declaration of Stan Karas as Exhibit E.) As demonstrated below, the striking contradictions between Sedlik's expert opinion in *Straus* and in this case prove that his approach is unreliable "junk science."

Sedlik opined that "*multipliers may not be used to calculate actual damages*." *Straus* Report, at 15 (emphasis added). Sedlik stated that "[A]s an expert I would not classify multipliers as 'actual damages' as this classification is inconsistent with copyright law. . . . [A] retroactive licensing scheme based upon multipliers should not be applied in determining the fair market value of the licensed uses in this matter prior to any alleged infringements." *Id.* at 18. In this case, however, Sedlik reaches a diametrically opposite conclusion: "To calculate actual damages, I obtained license fee quotes from two leading stock photography agencies, Getty Images and Corbis . . . *I then added a treble multiplier for the scarcity of the photographs*." Sedlik Report at 15 (emphasis added).

---

9 Sedlik violated Rule 26(a)(2)(B) by failing to disclose his *Straus* report case in his expert report in this case. Defendants learned of Sedlik's report in that case only during his deposition. Sedlik also failed to comply with defendants' subpoena by refusing to produce a copy of his expert reports, including the *Straus* report. The *Straus* report was produced only after the Court granted defendants' motion to compel.

In another striking similarity to this case, in *Straus*, Sedlik rejected the plaintiff's claimed market rate for a license:

> [I]t is my opinion that Straus has quoted fees to DVC that are not only above market rates, but are above the value of Straus' work as determined by the viability of his image on the marketplace. . . . *Straus first licensed his image to GSK at a relatively reasonable rate . . . Once Straus was "in the door"* at DVC, and once he determined that DVC had strongly associated GSK's brand and products with his photograph, *Straus then escalated his fees* for the same or similar use when quoting fees for re-use of his image. *In effect, Straus made an attempt to hold GSK's brand hostage.* When they called his bluff and moved to using other images, Straus sued [claiming infringement]." *Straus* Report at 17 (Emphasis added.)

Here, by contrast, Sedlik testified "I'm certain that Mr. Masterson, in analyzing the needs of his client, would determine which images needed to be used, and knowing about advertising, wanted that repeated exposure [of his images] to establish that brand and so would have continued to use those images." Sedlik Depo. Tr., 150:12-17.[10] Sedlik then sought to justify applying a 300% multiplier to the license rates he obtained from Corbis and Getty because the Arizona Biltmore valued and made extensive use of Masterson's images. Sedlik also claims that "[t]o avoid paying Masterson license fees for continued use of Masterson's photograph of Squaw Peak, Biltmore [infringed by] commission[ing] photographer Evan Schiller to replicate Masterson's photograph." Sedlik Depo., 155:1- 156:4; Sedlik Report, at 13. This is just like Straus' attempt "to hold GSK's brand hostage," a position that Sedlik rejected in his expert opinion in that case.

Further, the *Straus* plaintiff claimed that the defendants infringed by using Arnold Palmer's photograph, to which they had only a limited-use license, on the Internet. p. 9. Sedlik opined that this use "was made under an implied license for self promotional use, based upon customary and standard industry practices, and thus did not constitute a copyright infringement upon Mr. Straus' photographs that had earlier been incorporated in those advertisements under license from Straus."

---

10 *See also* Declaration of Ed Masterson in Support of Opposition to Motion for Partial Summary Judgment [Docket No. 204], ¶¶ 4-5 ("Masterson . . . used [some of the "marquee" images at issue in this case] repetitively in advertising and marketing mediums to promote the Biltmore's image while creating a consistent, uniform marketing image repositioning the Biltmore image in the marketplace.").

*Straus* Report at 10. Here, plaintiff also alleges that defendant exceeded the scope of its license. Sedlik, however, reaches the opposite conclusion: "With respect to any and all [licensed] photographs created by Masterson and supplied to Biltmore, any use of such photographs by Biltmore or KSL, outside of the scope of the licenses granted by Masterson, constitutes an infringement on Masterson's copyright in such photographs." Sedlik Report at 12.

Sedlik's opinions regarding the alleged infringement through creation of purportedly derivative images of natural objects are similarly inconsistent. In *Straus*, Sedlik opined that

> No one photographer or copyright owner can rightfully claim a monopoly on portraiture featuring Arnold Palmer or any other person. Simple, straightforward portraits like [the plaintiff's] image enjoy "thin" copyright protection. . . . . [I]f others create portraits of the same subject, [the plaintiff] is not necessarily entitled to remedies – even if those portraits are similar or substantially similar to [the plaintiff's] image. (*Straus* Report, p. 6)

In this case, however, Sedlik claims that the Arizona Biltmore infringed by commissioning another photographer to take a photograph of Squaw Peak. Sedlik Report at pp. 12-13. There is, of course, no principled distinction between these two photographs of natural objects (*i.e.*, a person and a mountain).

The many contradictions between the two reports authored by Sedlik within several months of each other demonstrate that he is not qualified to testify as an expert. Consistency is the benchmark of admissible expert analysis. Contradictions and discrepancies -- such as those in Sedlik's wildly divergent "expert" opinions -- are a tell-tale sign of inadmissible "junk science."

## III. SEDLIK IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ON DAMAGES

Plaintiff has the burden to prove that Sedlik is qualified as an expert on the subject of damages in copyright infringement cases. *Daubert I*, 509 U.S. at 593, n.10; *Daubert II*, 43 F.3d at 1316. It is axiomatic that to testify as an expert, the witness must *be* an expert "by knowledge, skill, experience, training, or education." *Fed. R. Evid.* 702. This means that "the subject matter [of the expert testimony] must be closely related to a particular profession, business or science and not within the common knowledge of the average layman." *Graham by Graham v. Wyeth Lab*, 906 F. 2d 1399, 1407-08 (10th Cir. 1990).

For instance, in *United States v. Chang*, 207 F.3d 1169 (9th Cir. 2000), the Ninth Circuit affirmed the exclusion of expert testimony offered by a professor of clinical marketing who testified as to the authenticity of an allegedly counterfeit Japanese bank certificate. *Id.* at 1171. The professor had neither formal training nor experience in identifying counterfeit foreign securities. *Id.* at 1172-73. Although the professor was an expert in international finance and was well-qualified to testify as to the underlying indicia of authenticity, the court concluded that he was unqualified to determine whether particular securities were counterfeit, which was the relevant issue. *Id.* Other courts have excluded expert testimony on similar grounds.[11]

Similarly, Sedlik's experience as a professional photographer does not qualify him to offer expert opinion regarding plaintiff's damages. A witness' expertise in one field does not make him an all-purpose expert on other topics, especially one that is as technical as the calculation of actual damages in a copyright case. Although Sedlik offers extensive calculations of plaintiff's purported damages, including offsets for inflation, he is not an economist or an accountant. He has not taken any advanced classes in business administration, and has no background in statistics, mathematics, accounting, or economics. Accordingly, Sedlik has no discernible expertise to opine on the damages purportedly suffered by plaintiff. He is simply not the right person to offer expert opinions on the subject. Because plaintiff has not met its burden to show that Sedlik qualifies as a

[11] *See e.g., Smith v. Goodyear Tire & Rubber Co.*, __ F.3d __, 2007 WL 2200700 (5th Cir. 2007) (affirming exclusion of an expert on polymers from testifying regarding tire failure because he did not have experience with tire design, manufacture, or malfunction); *Sun Ins. Mktg. Network, Inv. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1245 (M.D. Fla. 2003) (an accountant was not qualified to opine with respect to valuation of an insurance agency because the accountant had never appraised insurance agencies; had no independent background information on insurance industry; had not worked in that industry in the last 10 years; did no research or analysis of the insurance market prior to providing the valuation; only read some Internet articles of no more than 15 pages in length on the issue; and did not discuss various approaches for appraising a business or different factors that a business valuator should normally consider); *First Savings Bank v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1083-84 (D. Kan. 2000) (excluding testimony by a proposed expert who attempted to opine on lost profits resulting from unlawful use of a trademark because expert was not a Certified Public Accountant, had never been asked to value harm caused by use of a trademark, had never testified either by deposition or in trial concerning the subject of his proposed testimony, and had never published any literature on the subject).

damages expert, *Daubert* and its progeny mandate his exclusion. *See Smith*, __ F.3d __, 2007 WL 2200700; *Chang*, 207 F.3d at 1172-73; *Sun Ins. Mktg. Network, Inv.*, 254 F. Supp. 2d at 1245; *First Savings Bank*, 117 F. Supp. 2d at 1083-84.

## IV. SEDLIK OFFERS IMPROPER LEGAL CONCLUSIONS

A properly qualified expert witness may testify within his expertise if his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Fed. R. Evid.* 702. Opinions on questions of law have consistently run afoul of this rule. *Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892, 898-99 (9th Cir. 1993) (holding that an insurance expert's declaration that a sulphur dioxide cloud constituted a "hostile fire" as described in the insured's policies was improper legal testimony); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) (expert testimony regarding contract interpretation was an impermissible conclusion of law); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (district court properly excluded expert testimony regarding whether reliance was legally reasonable and foreseeable); *see also Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("[I]t is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case and to decide any purely legal issue."); *U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (expert testimony that "undertakes to tell the jury what result to reach . . . does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"); *Playboy Enters., Inc. v. Terri Welles, Inc.*, 78 F. Supp. 2d 1066, 1100 (S.D. Cal. 1999) ("Federal Rules of Evidence 702 and 704 were not intended to allow experts to offer opinions embodying legal conclusions."); *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, *2 (S.D.N.Y. 2002) ("Having reviewed Levko's [expert] report, I conclude that his testimony is inadmissible because . . . it addresses issues of law.")

Sedlik's report repeatedly violates this fundamental rule. Sections of his report are entitled "Infringement," "Statutory Damages and Attorney Fees" and "Disgorged Profits," and contain nothing but legal conclusions. Sedlik Report, p. 12, 14, 22. Sedlik also opines:

- "Any of the photographs by Biltmore in media not licensed by Masterson is an infringement on Masterson's Copyright." Sedlik Report at 12
- "[W]here Defendants have sublicensed Masterson's photographs to third parties, each such instance is an infringement on Masterson's copyright in the photographs." *Id.* at 12, *see also* p. 16 (same).
- "[W]hen Biltmore commissioned another photographer to replicate an existing Masterson photograph of Squaw Peak, Biltmore infringed on Masterson's copyright in that photograph." *Id.* at 12.
- "Even a simple photograph of an object is protected by copyright." *Id.* at 14.
- "If my understanding is correct, then Masterson is not entitled to Statutory Damages or attorney's fees under Copyright Law, but may be otherwise entitled to attorney's fees." *Id.*
- "Actual damages are determined in part by the fee that a willing buyer would have been reasonably required to pay at the time of the infringement." *Id.* at 14-15.
- "Masterson is entitled to all elements of KSL's gross revenue (less deductible expenses) that KSL fails to prove are not attributable to their use of Masterson's photographs." *Id.* at 22 (citing the Copyright Act).
- "KSL contribut[ed] to and induc[ed] infringement of Masterson's copyrights." *Id.* at 30

Sedlik's legal opinions are clearly beyond the scope of permissible expert testimony under Rule 702. *See also McHugh v. United Service Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999); *Crow Tribe of Indians*, 87 F.3d at 1045; *Aguilar*, 966 F.2d at 447; *Nieves-Villanueva*, 133 F.3d at 100. Accordingly, the Court should bar Sedlik from offering any testimony regarding defendants' alleged liability for copyright infringement and any other legal conclusions.

Further, even if Sedlik's legal opinions were admissible, they could be irrelevant because defendants have stipulated to liability. Actual damages is the only issue left for trial.

Accordingly, Sedlik's opinions concerning defendants' liability are inadmissible because they are irrelevant and would needlessly waste time at trial. *Fed.R.Evid.* 401-402.

## V. SEDLIK'S OPINIONS REGARDING THE VALUE OF THE ALLEGEDLY LOST IMAGES ARE IRRELEVANT TO PLAINTIFF'S CLAIM FOR COPYRIGHT INFRINGEMENT

A fundamental requirement of *Daubert* and Rule 702 is that the expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A substantial portion of Sedlik's report concerns plaintiff's claim that defendant has not returned 405 photographic negatives provided to it by plaintiff. Sedlik Report, pp. 25-30.[12]

However, the *sole* claim to be tried is for copyright infringement. "[N]o cause of action exists under the Copyright Act for withholding tangible copies of works and thereby purportedly preventing their exploitation." 2 NIMMER ON COPYRIGHT, § 8.01[A] at 8-16; ("a defendant's mere withholding of the physical copy of plaintiff's copyrighted work does not constitute infringement."); *see also* William M. Hart, et al., AN OVERVIEW OF COPYRIGHT LAW, 783 PLI/Pat 7, 54 (2004) ("a defendant's mere withholding of the physical copy of plaintiff's copyrighted work does not constitute infringement.").

*Frasier v. Adams-Sandler, Inc.*, 94 F.3d 129 (4th Cir. 1996) is "on all fours" with this case. In *Frasier*, plaintiff asserted a copyright infringement claim based upon the defendant's withholding of photographic slides. The Fourth Circuit affirmed dismissal of the claim because "the plain language of the copyright law requires that an infringer do or authorize reproduction, printing, or other use of the copyrighted material." *Id.* at 130 (*citing* 17 U.S.C. § 106). "Frasier asserts that Adams-Sandler infringed his copyright when he failed to return the copyrighted material upon request. . . . Because Frasier does not allege that Adams-Sandler used or authorized the use of his copyrighted photographs, *Adams-Sandler cannot be held liable as an infringer*." *Id.*

---

[12] Sedlik opines that plaintiff suffered $810,000 in actual damages as a result. Sedlik Report, p. 29.

(emphasis added); *see also Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F.Supp. 709, 721 (S.D.N.Y.1995) (rejecting copyright claim where the defendant allegedly misappropriated engineering designs but did not make copies); Howard B. Abrams, LAW OF COPYRIGHT, § 5.3 (2006) ("wrongdoing involving a copyrighted work will not constitute an infringement unless one of the rights granted the copyright owner by the Copyright Act is violated."); Raymond T. Nimmer, INFORMATION LAW, § 6.14 (2007) ("copyright does not create any exclusive rights relating to a right to possession of the copy").

The "lost images" claim is not actionable under the Copyright Act. The only issue at trial will be whether defendants wrongfully copied and/or distributed plaintiff's copyrighted images. Therefore, Sedlik's opinions regarding the value of the allegedly "lost" images cannot "assist the trier of fact to understand the evidence or to determine a fact in issue." *Fed. R. Evid.* 702. Accordingly, these opinions are inadmissible and irrelevant. *Id., Fed. R. Evid. 401-403.*[13]

## VI. SEDLIK'S DAMAGES ANALYSIS IS INADMISSIBLE AS A MATTER OF LAW

"One of the factors the Court must consider in determining whether to admit expert testimony is whether it 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *American Booksellers Ass'n*, 135 F. Supp. 2d at 1041 (*quoting Daubert I*, 509 U.S. at 951. "A court may conclude that there is simply too great an analytic gap between the data and the opinion proffered." *Id.* (*quoting Gen. Elec. Co.*, 522 U.S. at 146). Therefore, if an expert opinion is not supported by sufficient facts or is contradicted by indisputable facts in the record, the Court should exclude the opinion. *See id.; Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L. Ed. 2d 168 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of

---

[13] In any event, Sedlik's $2,500 per image damage estimate is an improper attempt to circumvent the Court's June 7, 2005 order [Dockt. No. 172], holding that plaintiff is not entitled to a receive $2,000 per image pursuant to the liquidated damages clause of the parties' licensing agreements.
Similarly, Sedlik's opinions regarding the allegedly infringing image created by Evan Schiller and plaintiff's alleged entitlement to disgorgement of defendants profits are foreclosed by the Court's orders granting summary judgment on these issues. Doct. Nos. 237 and 247.

the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Johnson Elec. N. Am., Inc. v. Mabuchi N. Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) ("even where an expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible.").

Courts routinely exclude expert opinions that ignore facts and rely instead on speculative projections. *See Atlantic Richfield Co. v. Farm Credit Bank of Wachita*, 226 F.3d 1138, 1166-67 (10th Cir. 2000) (excluding expert testimony because expert failed to account for the actual amount of the royalties received by similar companies in calculating the fair market value); *Johnson Elec. N. Am.*, 103 F. Supp. 2d at 283-284 (excluding expert testimony because expert based his damage calculations on estimates of the number of plaintiff's products instead of reliable empirical data); *JRL Enter., Inc. v. Procorp Assoc.*, 2003 WL 21284020, at *7 (E.D. La. June 3, 2003) (excluding testimony as nothing more than "an exercise in arithmetic on unreliable values," where expert's numbers had no basis in reality); *Kemp v. Tyson Seafood Group, Inc.*, 2000 WL 1062105, *2 (D. Minn. July 19, 2000) (excluding expert testimony where expert disregarded the plaintiff's actual historical sales in calculating lost profits); *JMJ Enter., Inc. v. VIA Veneto Italian Ice, Inc.*, 1998 WL 175888, *10 (E.D. Pa. Apr. 15, 1998) (disallowing expert report and barring expert evidence because expert used unrealistic sales projections).

As set forth below, Sedlik's opinions are a textbook example of inadmissible expert testimony, and subject to exclusion on several independent grounds.

A. Sedlik's 300% "Scarcity Multiplier" Is Speculative and Unfounded

After Sedlik calculated the amount of "lost" license fees, he applied a 300% "scarcity multiplier" to arrive at more than $1 million in "actual damages for known infringements." Sedlik claims that the use of a multiplier is appropriate because by using plaintiff's photographs KSL "demonstrated that [it] believed that Masterson's photographs were superior to all other existing photographs during the time period that KSL exploited Masterson's photographs." Sedlik Report, p. 23. Sedlik opines that KSL acknowledged the photographs' value because "[alt]hough KSL could have easily afforded to hire another photographer . . . , KSL elected not to do so, instead continuing to use Masterson's photographs. . . ." *Id.*

The "scarcity multiplier" is a transparent attempt to inflate plaintiff's damages. First, Sedlik claims that the application of a "scarcity multiplier" is justified because KSL acknowledged the value and scarcity of plaintiff's photographs by continuing to use them after the licenses expired. Sedlik Report, p.23. This approach would permit plaintiffs to apply a multiplier in *every* copyright case involving the unauthorized use of material beyond the scope of a license. It would eviscerate the Copyright Act's mandate that plaintiffs may recover only their actual damages, and that punitive damages are not available. *See*, *e.g.*, *Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 308 (S.D.N.Y. 2001). In fact, defendants are not aware of any reported copyright decisions that apply a "scarcity multiplier" in calculating actual damages.

Second, the 300% multiplier is not supported by any admissible evidence. Sedlik claims that he applied the multiplier because "[i]t's fundamentally part of supply and demand." Sedlik Depo. Tr., 146:11-19. But Sedlik is not an economist, and is not qualified to perform "supply and demand" calculations, let alone to offer expert opinions on the topic. Indeed, the multiplier is based solely on Sedlik's experience as a photographer and his conversations with other photographers about licensing generally. *See* Sedlik Depo. Tr., 147:19-24 ("Q. How did you determine that it's 300 percent and not 100 percent or 15 percent? A. Based on my knowledge and experience as a licensor of images and somebody who has spent the last 15 years talking with other photographers about licensing, that's my determination.") Because Sedlik admits that his conclusions regarding a multiplier are based on intuition and not the facts of the case, they must be excluded as a matter of law. *See American Booksellers Ass'n*, 135 F. Supp. 2d at 1041.

Third, Sedlik's conclusions are inconsistent. Sedlik admits that plaintiff's images are not "scarce" because KSL hired a photographer to reproduce the Squaw Peak image. Sedlik Report, p 13-14. Indeed, there is nothing unique about plaintiff's photographs of the Arizona Biltmore's grounds. Any competent photographer can take a picture of a hotel's front entrance, its pool, or a cabana. As Sedlik would concede, each of these images, as taken by different photographers, would be unique and would not infringe on plaintiff's copyright. Sedlik Depo. Tr., 20:2-21:3.

Sedlik himself acknowledges that there are innumerable photographers who are available to -- and some who allegedly did -- create photographs to replace plaintiff's images. *Id.*, 146:2-10.[14] Accordingly, all available evidence contradicts Sedlik's contention that a "scarcity multiplier" is appropriate because plaintiff's images were unique and irreplaceable.

Fourth, Sedlik's opinion is inadmissible because he knowingly ignored the actual history of the parties' licensing practices in applying the "scarcity multiplier."

> Q. In preparing the opinion and in calculating the rates that you think Masterson could have charged, including using the scarcity multiplier, have you compared the rates that he's actually been able to charge other clients?
>
> A. No.
>
> Q. Did you consider that he did not charge the scarcity multiplier during the period of the agency agreements [with the Arizona Biltmore]?
>
> A. It looked to me that he was charging appropriate fees for the use of the images as he went along in the middle of that agreement. It's a little bit difficult to ascertain because the specific photographic usage fees are sometimes not itemized. (Sedlik Depo. Tr., 184:13-185:2)

In other words, Sedlik knowingly ignored the low rates that plaintiff customarily charged the Arizona Biltmore for photography licenses, which are not even close to Sedlik's seven figure damages estimate.[15] Nor did Sedlik consider the licensing rates that KSL has used with other photographers. Similarly, Sedlik does not consider plaintiff's low licensing rates on non-KSL projects. Sedlik also did not perform any surveys into what other photographers charge for comparable images. In sum, Sedlik ignored all evidence that would lower his damages calculations. *Concord Boats Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)

---

[14] In other words, the commercial photographs at issue here easily distinguishable from those that are truly "scarce": *e.g.*, the photograph of Lee Harvey Oswald being shot.

[15] For instance, plaintiff charged only $300 for a stock photography license for an 85,000 unit newsletter print run. Similarly, the Biltmore paid only $10,000 for a full buy-out of copyrights of numerous images from plaintiff's 1998 photoshoot. *Id.*, Exh. H.

(expert opinion that "did not incorporate all aspects of the economic reality of the [relevant] market" was inadmissible).

It is well established that computations of actual damages in copyright cases must consider the parties' prior licensing transactions. For instance, in *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2003), the court granted the defendant's motion in limine to exclude the plaintiff's damages expert because she did not consider how much the plaintiff would have charged to license the photograph at issue. *See also Curtis v. Gen. Dynamics Corp.*, 1990 WL 302725 (W.D.Wash. 1990) (awarding actual damages in the amount of the plaintiff's pre-infringement license bid). Because Sedlik's analysis ignores crucial facts it is unreliable and, thus, inadmissible.

B. Sedlik's Calculation of Damages Based Upon the Website Defendants' Usage Ignores Industry Custom and Practice

The key to Sedlik's multi-million dollar damages conclusions is his assumption that every defendant, including numerous travel agency websites, would negotiate separate licenses with plaintiff individually. In the real world however, any hotel, including the Arizona Biltmore, would have negotiated a master license (i.e., "web pack") that would allow it to offer the photographs to third party websites for promotional purposes.[16]

Both Corbis and Getty confirmed that they provide such broad license rights. Defendants' expert asked Getty to confirm that

> the [Web Pack] license would include the right to use the image in advertisements on travel websites that promote our site or service (for example, Orbitz.com or HotelsOnline.com). Additionally, I understand that the license covers advertisements on promotional travel websites even if there is no direct link back to our site as long as the image is used to promote the Arizona Biltmore.

---

[16] *Cf. Mackie v. Reiser*, 296 F.3d 909 (9th Cir. 2002) (actual damages in a copyright case are calculated by what a willing buyer would have paid a willing seller); NINTH CIRCUIT MODEL JURY INSTRUCTION, 20.23 (actual damages is "the amount a willing buyer would have been reasonably required to pay to a willing seller at the time of the infringement for the use made by the defendant of the plaintiff's work.").

Mary Velasko, Getty's Sales Development Executive, responded, "Yes, you are correct." Karas Decl., Exh. F. Similarly, Tony Carbajal, an Account Executive at Corbis, stated

> the Web Pack License covers unlimited Web use [of licensed images] in any type of industry for a time period for commercial/advertising/promotional usages. This is not limited to just banners and links on your own site, and you can use other sites that do not have a direct link back to yours because it's still a promotional nature. (Karas Decl., Exh. G).

Indeed, such a licensing scheme is consistent with the Arizona Biltmore's practice of providing promotional images to travel agents for free.

Sedlik, however, assumes that each website defendant, no matter how small, would separately pay the top market rate to license plaintiff's images. This hypothetical is wholly unmoored from reality.[17]

*Bruce v. Weekly World News, Inc.*, 310 F.3d 25 (1st Cir. 2002), is instructive. The plaintiff claimed that the defendant infringed his photograph by publishing it in a newspaper and on the Internet, and also sought $359,000 in purported lost license fees from the use of this photograph on the publisher's tee-shirts and other merchandise. The defendant, however, presented evidence that it did not have a practice of paying license fees for each individual use, but would include them in the initial license fee. *Id.*, at 29-30 ("proof of industry practice inarguably is crucial to the estimation of actual damages."). The First Circuit held that the plaintiff could receive only $17,000 in actual damages, *i.e.*, what he would have received for a broad up-front license. So here. Sedlik does not dispute that travel websites do not pay for promotional images, but rather receive them for free. Accordingly, the proper actual damages figure is the cost of an all-inclusive license by the Arizona Biltmore, not an aggregation of dozens of individual license fees. Because Sedlik employs the latter approach, his methodology is fundamentally unsound.[18]

---

[17] Websites of Internet travel agents feature hundreds, if not thousands, of images of hotels. Travel agents would be bankrupted if they were required to pay market rates to license these images individually.

[18] *See Jarvis v. K2, Inc.*, 486 F.3d 526, 533-35 (9th Cir. 2007) (the district court properly rejected the conclusions of the plaintiff's damages expert because he added the monthly license fees (footnote continued)

Sedlik's analysis is erroneous for the additional reason that it adds up all "known infringements" without regard for which defendants remain in the case. In other words, Sedlik does not exclude from his calculations the numerous third party defendants with whom plaintiff has already settled. It is axiomatic that these settlement amounts should be off-set against the damages figure. *Arbuthnot v. Relocation Realty Service Corp.*, 227 Cal.App.3d 682, 687 (1991) ("[A] good faith settlement bars nonsettling defendants from seeking contribution from a settling defendant, but in return the nonsettling defendants' ultimate liability to the plaintiff is reduced by the amount stipulated by the release or by the amount of consideration paid.").

C. <u>Sedlik's Conclusions Regarding the Effect of Infringement on the Market Value of Plaintiff's Photographs</u>

Sedlik claims that the alleged infringement had a detrimental effect on the market value of plaintiff's photographs. This assertion lacks any evidentiary support. Masterson testified that he has not tried to license his Biltmore photographs to any third parties.[19] Sedlik also has not performed any research regarding the effect of the infringement on the photograph's market value, such as interviewing potential licensors or major stock photography image banks (*e.g.*, Corbis or Getty). Nor does Sedlik cite any evidence to support his claim that plaintiff's photographs of the Arizona Biltmore have market value today.[20]

Sedlik's "lost opportunity" calculations are also fundamentally flawed because he ignores that plaintiff lacks property releases for the photographs at issue. As a matter of industry custom and practice, photographs of an architecturally significant building, such as the Arizona Biltmore

---

charged by Getty Images, as opposed to using a single proportionately lower fee for a longer term of use because "monthly prices are not particularly relevant since the annual price is only about twice as high; 'any reasonable business person . . . would pay to license the image[s] on a yearly basis rather than a monthly basis.'")

[19] Karas Decl., Exh. J (Masterson Depo. Tr.), 146:21-147:3 (" Q. Have you sold any of those to anybody else or licensed them to anybody else? A. With the situation we are in right now, we are not doing anything. Q. Have you had an opportunity to sell or license those photographs that you passed up? A. I wouldn't even let an opportunity exist at this point.")

[20] Because plaintiff's photographs are site-specific, the Arizona Biltmore is the only conceivable licensee of them.

(designed by Frank Lloyd Wright), are virtually worthless unless the property owner expressly permits their publication. By licensing a photograph without a release, the licensee exposes himself to legal claims from the property owner. Sedlik Depo. Tr., 196:15-24 ("Q. When do photographers get property releases? A. To be ultra safe and avoid any liability, you could get a property release at the time that you make the image, . . . Q. Is this something that licensees sometimes look for? A. Licensees that are not risk tolerant could probably appreciate a [property release].") Accordingly, the value of photographs of famous buildings without property releases is low.

Here, plaintiff did not obtain property releases from the Arizona Biltmore's management. Accordingly, it cannot realistically license these photographs to anyone but the Biltmore. Plaintiff certainly cannot obtain nearly a million dollars from licensing them to third parties. Because Sedlik ignores the crucial property release issue, his opinion is unreliable.

D. Sedlik Improperly Bases His Analysis on Gross Licensing Revenue

Sedlik improperly assumes that plaintiff's hypothetical licensing activity would result in pure profit. In other words, Sedlik's damages analysis is based upon gross, not net, revenue. *See, e.g.*, Sedlik Depo. Tr., 89:25-90:6 (admitting that he did not use licensing expenses or overhead in his damages calculations). The courts reject such sleight-of-hand. For instance, in *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983), the plaintiff claimed that he suffered $19,300 in lost sales due to the defendant's copyright infringement. Judge Posner rejected his theory, explaining

> a loss of revenue is not the same thing as a loss of profits. If you sell less of your product you will have lower costs, and the cost savings is a gain that must be offset against the loss of revenues in computing lost profit. [The plaintiff] did not subtract a penny from the $19,300 that he estimated to be his lost sales revenues. This implies, improbably, that he could have made all the lost sales at zero cost.

*Id.* at 1121; *see also Regents of University of Minnesota v. Applied Innovations, Inc.*, 685 F. Supp. 698 (D. Minn. 1987) (calculating actual damages by multiplying lost revenue by a 20% estimated profit margin); HOWARD B. ABRAMS, LAW OF COPYRIGHT, § 17.2 (ed. 2006) ("Where a plaintiff seeking to recover its lost profits as its actual damages proves only its gross price rather than its

profit, the courts have refused to award the sum as damages on the grounds that such an award would be too speculative.")

Here, Sedlik failed to consider plaintiff's costs in licensing his photographs. Thus, he did not consider such costs as overhead, secretarial expenses, advertising expenses, costs of billing and collection, and numerous other costs that would necessarily reduce plaintiff's profit margin.[21] These basic mistakes render his opinions unreliable and, thus, inadmissible.

E. Sedlik's Conclusions Fail the "Common Sense" Test

"In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc.*, 103 F. Supp. 2d at 286 (despite its "dazzling sheen of erudition," expert's report reached "a result which any average person could readily recognize as preposterous."). By claiming that plaintiff has suffered more than two million dollars in actual damages, Sedlik reached an equally preposterous result.[22]

Plaintiff's principal, Ed Masterson, is a commercial photographer. Most of plaintiff's income has come from its services as an advertising agent, and not as a licensor of stock photography. *See* Sedlik Depo., 165:6-9 (plaintiff's "concentration is not on . . . creating stock, specifically purpose for stock licensing."); Karas Decl., Exh. D. (Bybee Report), at p. 10 (plaintiff's income was derived largely from his services as a marketing agent). Indeed, plaintiff agreed to a complete buy-out of copyrights from a series of photographs taken at the Arizona Biltmore for only $10,000. *See* Karas Decl., Exh H. When plaintiff licensed stock photography to the Arizona Biltmore in its role as the hotel's advertising agent, it generally did not include

---

[21] Plaintiff's profit and loss statements show *65 categories* of expenses. *See* Karas Decl., Exh. I.

[22] The courts routinely reject copyright holders' claims for actual damages that are excessive on their face. *See*, *e.g.*, *Jarvis*, 486 F.3d at 332-35 (affirming an award of $40,107 in actual damages for infringement of 58 photographs, and upholding the district court's rejection of a much higher figure claimed by the plaintiff's expert); *Baker v. Urban Outfitters*, 431 F. Supp. 2d 351 (S.D.N.Y. 2006) (ordering the plaintiff to pay $424,185.04 in fees and sanctions because he pursued a meritless claim for $260,000 in actual damages, when only $3,896 was ultimately awarded). Here, the parties participated in numerous settlement conferences, but plaintiff continues to demand a seven figure settlement.

licensing fees as a separate item on the bill. *See* Sedlik Depo. Tr., 184:19-185-2. Plaintiff does not appear to have licensed -- or even tried to license -- his Biltmore-related photographs to third parties. *See supra* fn. 19. Likewise, plaintiff has not presented any evidence that there is a market for the photographs at issue, that he has submitted them to an image bank such as Corbis or Getty, or that any third party has ever expressed any interest in licensing them.

Under these circumstances, it is preposterous for Sedlik to claim that plaintiff has lost more than a million dollars from the brief, unauthorized use of his photographs on the Internet. Indeed, defendants' experts conclude that plaintiff's damages do not exceed $20,000. *See* Karas Decl., Exh. C (Kinrich report), D (Bybee report). Seeking to inflate plaintiff's damages claims, Sedlik overreaches and constructs a damages model that lacks any connection to reality. Accordingly, Sedlik's conclusions fail the "common sense" test and should be excluded.

## VII. CROSS-EXAMINATION IS NOT A SUFFICIENT REMEDY

Plaintiff will likely argue that defendants may address the analytical deficiencies in Sedlik's analysis in cross-examination. The Supreme Court, however, has held that cross-examination is not a substitute for the Court's exercise of its gatekeeping function, but instead is appropriate only "*where the basis of scientific testimony meets the standards of Rule 702.*" *Daubert I*, 509 U.S. at 796 (emphasis added). Thus, "to conclude that evidence is admissible because it is subject to [cross-examination] is, therefore, circular." *Lithuanian Commerce Corp., Ltd.*, 179 F.R.D. at 458.

As set forth above, Sedlik's damages analysis is flawed from top to bottom, and falls far short of the threshold standards of Rule 702. Any reference to cross-examination is therefore a red herring. The purpose of Rule 702 to eliminate inadmissible expert testimony. Allowing Sedlik to testify merely because he is subject to cross-examination would eviscerate that purpose.

## Conclusion

Sedlik's pie-in-the-sky calculation of more than two million dollars in actual damages for the brief alleged infringement of ten unexceptional commercial photographs is analytically unsound, contrary to the evidentiary record, contrary to Sedlik's own prior conclusions, based

upon unbridled speculation, and fails the "common sense" test. Further, Sedlik is not qualified as a damages expert. Finally, he should not be permitted to opine on the ultimate legal issues at trial. For these reasons, the Court should grant this motion *in limine* in full.

DATED: November 5, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By /s/ David W. Quinto
David W. Quinto
Attorneys for Defendants KSL Biltmore Resort Inc., KSL Recreation Corporation, Jobing.com, Gannett, Inc., America West Vacations, Spa Finder Travel Arrangements, Ltd., Spring Training Tours, American Express Company, The Leisure Company, Internet Publishing Corporation